UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


THE WEST VIRGINIA INVESTMENT
MANAGEMENT BOARD and THE WEST
VIRGINIA CONSOLIDATED PUBLIC
RETIREMENT BOARD,

      Plaintiffs,

v.                                    CIVIL ACTION NO. 2:09-CV-01335

THE VARIABLE ANNUITY LIFE
INSURANCE COMPANY,

      Defendant.


<u>MEMORANDUM OPINION AND ORDER</u>


      Pending is the motion to remand of plaintiffs West

Virginia Investment Management Board and West Virginia

Consolidated Public Retirement Board, filed January 11, 2010.


I.


      Plaintiff West Virginia Consolidated Public Retirement

Board ("Public Retirement Board") is a statutorily created public

agency that administers public retirement plans including the

West Virginia Teachers' Defined Contribution Retirement System

("DCS") and the West Virginia State Teachers Retirement System

1

("TRS"). The Public Retirement Board is the trustee for these public retirement plans except with regard to investment of the funds of the State's defined benefit plans.[1] (Compl. ¶ 3).

Plaintiff West Virginia Investment Management Board ("Investment Management Board") is a statutorily created public body corporate that serves as the principal investment management organization for the State of West Virginia for long-term assets. (Id. ¶ 4). The Investment Management Board is also the trustee for the investment of the funds of all of the State's defined benefit public retirement plans, including TRS. (Id.).

Defendant Variable Annuity Life Insurance Company ("VALIC") is based in Texas and provides retirement services and products such as annuities. (Id. ¶ 2).

In 1941, the West Virginia Legislature created the TRS, a retirement system for teachers and other school service personnel. The TRS became a defined benefit plan in 1970. (Id.

---

[1] A defined benefit plan is a retirement plan in which participants do not "bear the risk for investment gains or losses. Instead, members and their employers make contributions to the plan, which are then invested . . . on behalf of the plan as a whole. When public employees retire, they become entitled to a monthly annuity calculated using a formula which takes the member's years of service and average salary into account." (Rep. 7).

¶ 9).  Due to concerns surrounding funding for the TRS, in 1990 the legislature created the DCS as an alternative to the TRS. The DCS differed from a defined benefit plan in that participants could control their own retirement accounts within the bounds of select investment options chosen by the Public Retirement Board. The legislature subsequently closed the TRS to new employees on July 1, 1991, and required all new employees to join the DCS. Existing TRS members were also given the option to transfer to the DCS.  (Id. ¶ 10).

In October 1991, the Public Retirement Board entered into the VALIC Group Fixed Annuity Contract, form GFA-582, Annuity Contract 25005, with VALIC.  (Id. ¶ 11).  This contract permitted VALIC to offer a fixed annuity investment option with a 4.5 percent minimum rate of return to DCS members.  (Id. ¶ 11). VALIC's sales personnel marketed and promoted this investment option to DCS members, including public school teachers, administrators and school service personnel.  (Id. ¶ 12).

Pursuant to the Public Retirement Board's contract with VALIC, the VALIC fixed annuity became one of several investment options available to all DCS members.  Many DCS members elected to invest some or all of their retirement funds with VALIC, which required the Public Retirement Board to transfer to VALIC some or

3

all of the mandatory contributions of 4.5 percent of each member's salary and the employer's 7.5 percent contribution. (Id. ¶ 13).  The Investment Management Board and the Public Retirement Board allege that contrary to VALIC's representations to DCS members, the value of VALIC's fixed annuity investments was generally not sufficient to support retirement for DCS members.  (Id. ¶ 14).

In 2008, the West Virginia Legislature recognized that many DCS members' investments would not be sufficient for retirement and also found that many of those members desired to return to or join a defined benefit system.  To remedy this situation, the legislature enacted West Virginia Code § 18-7D-1, et seq., which allowed DCS members to voluntarily transfer their membership and assets from the DCS to the TRS defined benefit plan based upon an election in which at least 65 percent of actively contributing DCS members had to elect to transfer their funds.  An election was held and more than 78 percent of actively contributing DCS members elected to transfer to TRS.  (Id. ¶¶ 15-16).

The transfer legislation mandated that the Public Retirement Board transfer the assets of electing DCS members to the TRS.  "[T]he [Public Retirement Board] shall transfer the

4

members and all properties held in the [DCS's] Trust Fund in trust for those members who affirmatively elected to do so during that period to the [TRS], effective on the first day of July, two thousand eight . . .."  W.Va. Code 18-7D-5(a); (Compl. ¶ 17); see also W.Va. Code § 18-7D-7(b)(1).

The transfer legislation provided that this large influx of members into TRS would be funded by the immediate transfer of those members' DCS assets into the TRS. (Id. ¶ 19). Because the Investment Management Board serves as the trustee for the investment of TRS funds, whereas the Public Retirement Board serves as the trustee for the investment of DCS funds, this move required a transfer of all assets of transferring members from the Public Retirement Board to the Investment Management Board. (Id. ¶ 20).

At the time of the July 1, 2008, transfer, VALIC held approximately $250 million of the transferring members' assets. (Id. ¶ 21).  Upon learning of the need for the withdrawal of the funds from its fixed annuities and the transfer of these funds to the Investment Management Board, VALIC threatened to impose an approximately $11 million surrender charge on the transfer of funds.  (Id. ¶ 22).

Confronted with VALIC's refusal to surrender the public funds without penalty, the Investment Management Board, as the trustee of these funds for investment purposes, submitted inquiries to VALIC to determine how the money of the public employees was invested. VALIC responded with information that was insufficient to allow the Investment Management Board to fully evaluate the potential risks or benefits of allowing these public funds to remain invested with VALIC. (Id. ¶ 24).

On December 10, 2008, the Public Retirement Board transferred the part of its interest in Annuity Contract 25005 that represented the assets of the transferring DCS members to the Investment Management Board, to fulfill the mandates of the transfer legislation. (Id. ¶ 25). As a result, VALIC and the Investment Management Board entered into Annuity Contract 69562, the terms of which were identical to Annuity Contract 25005. (Id.).

On December 18, 2008, the Investment Management Board requested the return of all funds held under Annuity Contract 69562. (Id. ¶ 26). VALIC refused to allow the Investment Management Board to withdraw the funds. Instead, VALIC claimed that the Investment Management Board's right to withdraw the money was restricted to two methods of withdrawal, both to occur

over five years: (1) the Five Year Equal Annual Installment
Method, whereby the Investment Management Board could only
withdraw the entire amount by withdrawing 20 percent per year for
five years, or (2) the Decreasing Balance Method, whereby the
Investment Management Board could only withdraw one-fifth of the
balance the first year, one-fourth of the remaining balance the
second year, one-third of the remaining balance the third year,
one-half of the remaining balance the fourth year, and the entire
remaining balance during the fifth year.[2]  (Id. ¶ 27).

        While the parties have never agreed about the right of
the Investment Management Board and the Public Retirement Board
to transfer these investments out of VALIC, VALIC in April 2009
permitted the withdrawal of 20 percent of the funds held under
Annuity Contract 69562.  (Id. ¶ 30).  That sum has been
transferred to the Investment Management Board.  (Id.).  VALIC
has refused to transfer the remaining balance, which is some $200
million, despite repeated demands.  (Id. ¶ 31).  VALIC claims
that the Annuity Contract prohibits the Investment Management
Board from withdrawing the full amount of the funds at once.  The

_____

        [2]The difference between the two alternatives is said to be
that under the Five Year Installment method "[n]o other
withdrawals may be made once payments begin," and under the
Decreasing Balance method "[w]ithdrawals may be made."  (Compl.
Ex. A).

Investment Management Board and the Public Retirement Board believe they are entitled to withdraw the full amount of funds upon demand.   (Id. ¶ 32).

Plaintiffs filed this action against VALIC on November 12, 2009, in the Circuit Court of Kanawha County.  (Not. of Removal 1).  Plaintiffs claim that there is a "dispute about the requirements of the written agreement governing [the Investment Management Board]'s request for withdrawal of the funds held by VALIC."  (Compl. ¶ 32).  Plaintiffs seek a declaration that they are "entitled to the withdrawal of the full amount of the public money held by VALIC" for participants of the TRS and the DCS, without restriction.[3]  (Id. at 8).  If plaintiffs are not entitled to the immediate withdrawal of all funds, they seek, on demand, full transparency and disclosure regarding the investments and assets underlying the fixed annuities.  (Id. at 9).  Finally, plaintiffs ask for their costs, expenses, and reasonable attorneys' fees.  (Id.).

_____

[3]In addition to the funds held by VALIC for TRS members who were previously members of the DCS, VALIC holds funds for DCS members who elected not to transfer to TRS.  The Public Retirement Board remains the trustee of these funds, which total approximately $60 million.  (Id. ¶ 29).  Although it is not clear, it appears the Public Retirement Board is asking for a declaration of its authority to fully withdraw on demand the $60 million as well or for full transparency respecting these funds.

8

VALIC timely removed this action on December 11, 2009, alleging diversity jurisdiction.  (Notice of Removal 1, 3).  On January 11, 2010, the Investment Management Board and the Public Retirement Board moved to remand this case for lack of diversity.  (Mot. to Remand 1).  The Investment Management Board and the Public Retirement Board assert that diversity is absent because neither plaintiff is a "citizen" of West Virginia.  Instead, plaintiffs assert that they are "arms" or "alter egos" of the State.  (Memo. In Support 1).  Defendant responded on January 29, 2010, and argued that plaintiffs are in fact citizens according to the <u>Ram Ditta</u> and <u>Maryland Stadium Authority</u> factors.  (Resp. 1-2).

II

"The burden of demonstrating jurisdiction resides with 'the party seeking removal.'"  <u>Maryland Stadium Authority v. Ellerbe Becket Inc.</u>, 407 F.3d 255, 260 (4th Cir. 2005) (citing <u>Mulcahey v. Columbia Organic Chems. Co.</u>, 29 F.3d 148, 151 (4th Cir. 1994)).  If federal jurisdiction is in doubt, the court should remand the case to state court.  <u>Id.</u> (citing <u>Mulcahey</u>, 29 F.3d at 151).

"For a suit to be 'between citizens of different states,' § 1332(a), 'each distinct interest should be represented by persons, all of whom are entitled to sue, or may be sued, in the federal courts.'" Maryland Stadium Auth., 407 F.3d at 260 (quoting Strawbridge v. Curtiss, 7 U.S. 267 (1806)). A state cannot be sued in federal court through diversity jurisdiction because a state is not a citizen for diversity purposes. South Carolina Dept. of Disabilities and Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir. 2008) (citing Moor v. County of Alameda, 411 U.S. 693 (1973)). Along the same line, a public entity created by state law, if an arm or alter ego of the State, is also not a citizen for diversity purposes. Id. (citing Maryland Stadium Auth., 407 F.3d 255, 260 (4th Cir. 2005)). "But an entity created by the State which functions independently of the State with authority to sue and be sued, such as an independent authority or political subdivision of the State, can be a 'citizen' for purposes of diversity jurisdiction." Id. (citing Moor, 411 U.S. at 717-18; Maryland Stadium Auth., 407 F.3d at 260). Thus, if either Investment Management Board or Public Retirement Board is an arm or alter ego of the State of West Virginia, the court must remand this case.

10

The test to determine whether a state-created public entity is an arm or alter ego of the State consists of a non-exclusive list of four factors to be considered:

> (1) . . . whether any recovery by the entity as plaintiff will inure to the benefit of the State; (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions; (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity's relationship with 'the State [is] sufficiently close to make the entity an arm of the State.'

South Carolina Dept., 535 F.3d at 303 (citing Maryland Stadium Auth., 407 F.3d at 261-62 and Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n, 822 F.2d 456 (4th Cir. 1987), and quoting Cash v. Granville County Bd. of Educ., 242 F.3d 219, 224 (4th Cir. 2001)).

III

If either plaintiff is an arm or alter ego of the State, diversity is destroyed and the case must be remanded.  For the reasons that follow, the Investment Management Board is an arm or alter ego of the State, requiring remand.

11

A.  Recovery to Inure to the Benefit of the State

        The first factor under <u>South Carolina Dept.</u> is
generally considered to be the most important one in determining
whether a state-created public entity is an arm or alter ego of
the State.  See <u>Ram Ditta</u>, 822 F.2d at 457; <u>Maryland Stadium
Authority</u>, 407 F.3d at 261-62.  The Investment Management Board's
recovery of the remaining $200 million from VALIC would inure to
the benefit of West Virginia because West Virginia Code § 18-9A-
6a(c) requires that the State fund the TRS's unfunded
liabilities.[4]

        Plaintiffs reason that § 18-9A-1 "makes the State
responsible for appropriating any amount necessary to correct any
unfunded liability of the [public retirement] system" because
that section ensures sufficient financial support for public
schools and teachers.  (Mem. 9).  A direct link between the
teachers retirement fund and the State treasury is found in § 18-
9A-6b and § 18-9A-6a.  Section 18-9A-6b states that an
appropriation "shall be allocated to the state teachers
retirement system, which appropriation and allocation shall be

---

        [4]TRS was underfunded by $3 billion dollars in 1994 and the
Legislature passed W. Va. Code § 18-9A-6a(c) as part of a 40-year
plan to replenish the fund.  <u>See</u> <u>West Virginia Education Assoc.
v. Consolidated Public Retirement Board</u>, 194 W. Va. 501, 507-508
(1995).

used to reduce the amounts required by section six-a of this article . . ..” Section 18-9A-6a provides for a yearly report by an actuarial firm that estimates how much funding is

> necessary to both eliminate the unfunded liability over
> a forty-year period beginning on the first day of July,
> one thousand nine hundred ninety-four, and to meet the
> cash flow requirements of the fund in fulfilling its
> future anticipated obligations to its members.  In
> determining the amount of funding required, the actuary
> shall take into consideration all funding otherwise
> available to the fund for that year from any source:
> Provided, that the appropriation and allocation to the
> teachers' retirement fund made pursuant to the
> provisions of section six-b of this article shall be
> included in the determination of the requisite funding
> amount.

§ 18-9A-6a(c).

VALIC contends that any money within the TRS's fund can only be used to pay TRS members, and that the State cannot use the funds for any other purpose; thus, the funds do not inure to the benefit of the State treasury. (Resp. 8-9).  However, “[t]he broader inquiry does not focus on whether funds are retained in a particular account of the State or in the general fund of the State treasury, but rather whether recovery here would inure to the benefit of the State.”  South Carolina Dept., 535 F.3d at 305.  While the TRS's funds are in a separate fund within the State treasury and cannot be used for anything but the payment of

13

members' retirements, this does negate the statutory mandate that requires the State to make up any of the TRS's unfunded liabilities.  See <u>West Virginia Education Assoc. v. Consolidated Public Retirement Board</u>, 194 W.Va. 501 (1995).  Thus, recovery by the Investment Management Board from VALIC would inure to the benefit of the State.

**B.  Degree of Autonomy**

VALIC argues that the Investment Management Board exercises significant autonomy apart from the state because its legislative mandate in West Virginia Code § 12-6-1a states that the Investment Management Board is to have an independent board and staff that is "'immune to changing political climates.'" (Resp. 13).  VALIC also asserts that the Investment Management Board is not subject to veto by the State and that the Investment Management Board has the power to "sue and be sued, manage its assets, pay its liabilities, promulgate and enforce its own rules and procedures, and formulate its investment policies."  (<u>Id.</u>); W.Va. Code § 12-6-5.  However, an entity can retain some "operational independence" and still be "closely tied to the state."  <u>Maryland Stadium Auth.</u>, 407 F.3d at 264.

The board of the Investment Management Board is made up

of the Governor, the State Auditor, the State Treasurer, and ten other individuals whom the Governor appoints.  W. Va. Code § 12-6-3; (Mem. 14).  The fact that the Governor sits on the board of the Investment Management Board and appoints a substantial majority of the board members is a clear indicator of state control.  See Maryland Stadium Authority, 407 F.3d at 264 and South Carolina Dept., 535 F.3d at 307 ("the fact that all of the University of Maryland's governing decisionmakers were appointed by the Governor was a 'key indicator of state control . . . .'").  The Governor also acts as the Chairman of the Board and is granted authority to "remove any trustee, other than trustees who serve by virtue of their elective office, in case of gross negligence or misfeasance . . .."  W.Va. Code § 12-6-4(b), (e).

In Ram Ditta, the Court of Appeals for the Fourth Circuit found that the Maryland National Capital Park and Planning Commission was autonomous from the state, noting that the state did not have control over the appointment or removal of commission members, and that the commission's budget was not subject to state approval.  Ram Ditta, 822 F.2d at 458.  Here, in addition to the Governor having authority to appoint and remove trustees, the Investment Management Board is required to undergo an annual audit and report its operational status to the

Governor, State Treasurer, State Auditor, President of the Senate
and Speaker of the House.  See W. Va. Code §§ 12-6-6 and 12-6-14;
Maryland Stadium Authority, 407 F.3d at 264-265.  This level of
State oversight over the Investment Management Board outweighs
its operational independence.  See Maryland Stadium Authority,
407 F.3d at 264.  Moreover, the operational independence of the
board is further mitigated by the absence of its power to levy
taxes, which is a "strong indication that an entity is more like
an arm of the state . . . because that enablement gives an entity
an important kind of independence."  See id. (quoting Kashani v.
Purdue University, 813 F.2d 843, 846 (7th Cir. 1987)).

        The foregoing analysis indicates that the Investment
Management Board does not exercise significant autonomy from the
State.  While the Investment Management Board has some
operational independence to the extent it was created to "operate
as an independent board with its own full-time staff of financial
professionals, immune to changing political climates," the State
exercises significant control through its representatives on the
board, through the Governor's power to appoint all remaining
board members, and through the Investment Management Board's
reporting and auditing requirements.  See W.Va. Code § 12-6-
1a(a)-(b).  Thus, while the Investment Management Board exercises

16

a degree of autonomy, it is ultimately under the control of the State and its Governor and other elected officers.

C.   State Versus Non-State Concerns

The Investment Management Board deals with funding matters of critical state-wide concern, including diminishment of unfunded liability for public employees' pension benefits.  West Virginia Code § 12-6-1 states that the purpose of the creation of the Investment Management Board is to "modernize the procedures for the investment of funds of the <u>state and its political subdivisions</u> for the purpose of increasing the investment return of those funds."  W. Va. Code § 12-6-1 (emphasis added).

Teachers and school personnel throughout West Virginia rely on the Investment Management Board to properly invest their funds for their retirement.  To the extent the Investment Management Board invests funds for employees of local school districts, it does so on a "state-wide basis," making its concerns primarily of a state nature.  <u>South Carolina Dept.</u>, 535 F.3d 307-08.  Further, the legislature has declared that "prudent investment provides diversification and beneficial return not only for public employees but for all citizens of the state . . .."  W. Va. Code § 12-6-1a(c).  Thus, the Investment Management

17

Board's purpose is plainly of state-wide concern.

D. How State Law Treats the Public Entity

"[A]lthough '[a] state court's view of the status of a state political entity is, of course, an important factor, . . . questions of eleventh amendment immunity are ultimately governed by federal law." Maryland Stadium Authority, 407 F.3d at 261-62 (quoting Ram Ditta, 822 F.2d at 459-60). "A court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." Id. at 265.

The legislature intended the Investment Management Board to have an independent board and staff, immune to changing political conditions with operational control over its daily activities. W. Va. Code § 12-6-1a(a); (Resp. 15). Nevertheless, other statutory law leans toward the Investment Management Board being an arm or entity of the State in that it must submit to an annual audit, it must report its operational status to five different state constitutional officers in the executive and legislative branches, its board is occupied by three state officials and chaired by the Governor, and the Governor appoints the remaining ten board members. See W. Va. Code §§ 12-6-3, 12-

6-6, and 12-6-14.  Furthermore, a Special Assistant Attorney General is representing the Investment Management Board in this litigation by virtue of a special appointment from the Attorney General of the State of West Virginia in light of "the significant effect the result of this case might have upon the State Treasury and because of the significant impact the decision may have upon the teachers of this State . . .."  (Rep. 19-20). Thus, although West Virginia law provides no express declaration as to whether the Investment Management Board is an arm or alter ego of the State, it is ultimately under the control of and must answer to the Governor as well as other constitutional officers of the State.


E.  Summary

        Application of the four South Carolina Dept. factors demonstrates that the Investment Management Board is an arm or alter ego of the State of West Virginia.  It is clear that the Investment Management Board's gain will inure to the benefit of the State, that it exercises some but not substantial autonomy apart from the State, that its responsibilities are of major statewide concern, and that state law treats it as a public entity sufficiently close to the State to make it an arm of the

State. This conclusion is supported by decisions of other courts that have directly considered whether public retirement systems are arms of the State.[5]  See Ernst v. Rising, 427 F.3d 351, 355 (6th Cir. 2005) (finding that the public retirement system is "most naturally characterized an arm of the state" when it is run by state officials or people appointed by state officials, it serves state employees, it is funded by the state treasury as well as by contributions from state employees, and if it faces a monetary shortfall state legislation requires the state treasurer to make up the difference with state funds."); McGinty v. New York, 251 F.3d 84, 99-100 (2d Cir. 2001) (holding that the New York State and Local Employees' Retirement System is an arm of the State);  JMB Group Trust IV v. Pennsylvania Mun. Ret. Sys., 986 F.Supp. 534 (N.D. Ill. 1997); Schulthorpe v. Virginia Ret.

_____

[5]VALIC cites the unpublished, and thus nonprecedential, opinion of Roche v. Lincoln Property Co., 175 Fed.Appx. 597 (4th Cir. 2006) in support of its argument that the Investment Management Board is not an arm of the State. In Roche, the Court of Appeals for the Fourth Circuit applied the four factors and found the State of Wisconsin Investment Board ("SWIB") not to be an arm of the State.  Roche is distinguishable, however, because the purpose of the SWIB is broader than that of the Investment Management Board, in that it was created as an independent state agency charged with managing the money and property of the state in over 40 separate funds, and with accomplishing the goals of each specific fund.  A SWIB fund owned, and provided management for, the apartment complex where the plaintiffs were injured, and any associated liabilities were specifically assessed solely against the fund and not the State treasury.  Id. at 600-01.

Sys., 952 F.Supp. 307, 309-10 (E.D. Va. 1997); Hair v. Tennessee Consol. Retirement Sys., 790 F.Supp. 1358 (M.D. Tenn. 1992).

IV.

An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal. 28 U.S.C. § 1447(c). The district court has a measure of discretion in determining whether to award fees when it chooses to remand a case. In re Lowe, 102 F.3d 731, 733 (4th Cir. 1996). Bad faith is not a prerequisite to obtaining attorney's fees under 28 U.S.C. § 1447(c). Id.

The court declines to award attorney's fees to the plaintiffs in this instance. Defendant's attempt to remove this case to federal court appears to have been objectively reasonable in view of the absence of any prior determination that either plaintiff is an arm of the State, the unpublished Fourth Circuit decision in Roche and the limited autonomy afforded the Investment Management Board as found herein. See Martin v. Franklin Capital Corp., 546 U.S. 132, 136 (2005). Further, it does not appear that the defendant acted in bad faith. Thus, the plaintiffs' request for attorney's fees is denied.

21

V.

Based upon the foregoing, the court concludes that it lacks subject matter jurisdiction.  The court, accordingly, ORDERS that plaintiffs' motion to remand be, and it hereby is, granted.  The court further ORDERS that this action be, and it hereby is, remanded for all further proceedings to the Circuit Court of Kanawha County.

The Clerk is directed to forward a copy of this written opinion and order to counsel of record and a certified copy shall be sent to the clerk of court for the Circuit Court of Kanawha County.

DATED: July 26, 2010

John T. Copenhaver, Jr.
United States District Judge